In the

# United States Court of Appeals
## for the Seventh Circuit

_____

No. 21-1959

N.J., by his next friend KELLY JACOB, and
A.L., by his next friend TARA LLOYD,

*Plaintiffs-Appellants*,

*v.*

DAVID SONNABEND, in his official capacity
as associate principal of Shattuck Middle School,
and JUSTIN BESTOR, in his official capacity as
principal of Kettle Moraine High School,[*]

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
Nos. 20-C-227 & 20-C-276 — **William C. Griesbach**, *Judge*.

_____

ARGUED NOVEMBER 12, 2021 — DECIDED JUNE 15, 2022

_____

---

[*] Beth Kaminski was the principal of Kettle Moraine High School during the events at issue in this case and was the original defendant in plaintiff A.L.'s lawsuit. Counsel advised us after oral argument that she no longer holds that office and that Justin Bestor, the associate principal, succeeded her. We substitute Bestor for Kaminski. *See* FED. R. APP. P. 43(c)(2).

Before SYKES, *Chief Judge*, and RIPPLE and ST. EVE, *Circuit Judges*.

SYKES, *Chief Judge*. This case raises a constitutional challenge to restrictions on student speech. The plaintiffs are two teenagers who attend Wisconsin public schools. Both are gun enthusiasts and supporters of the Second Amendment. To express that support, they own and wear T-shirts that communicate their favorable opinion of the right to bear arms. When they wore those shirts to school, however, they got into trouble with school officials.

In February 2020 when plaintiff N.J. was in seventh grade at Shattuck Middle School in Neenah, he went to school wearing a T-shirt displaying a Smith & Wesson logo. The logo included an image of a revolver. Around the same time, A.L., a student at Kettle Moraine High School in Wales, went to school wearing a T-shirt bearing the logo of Wisconsin Carry, Inc., a gun-rights group. This logo too incorporated an image of a handgun.

Administrators at both schools barred the boys from wearing the shirts, explaining that any clothing depicting firearms is forbidden. Neither school's dress code *expressly* bans clothing with images of firearms. Rather, the dress codes prohibit "inappropriate" attire, which the administrators interpreted to bar any clothing with an image of a firearm regardless of whether it conveys support for or opposition to gun rights.

N.J. and A.L. sued the administrators in separate lawsuits alleging violations of their free-speech rights under the First Amendment. They sought declaratory and injunctive

relief under 42 U.S.C. § 1983. The district court consolidated the cases.

Ruling on cross-motions for summary judgment, the judge found for the school administrators. He declined to apply *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), which established the legal standard for student-speech cases. Instead, he looked to First Amendment forum doctrine. Applying the standard for speech restrictions in a nonpublic forum—the most lenient test—he upheld the administrators' actions as viewpoint neutral and reasonable.

The judge's decision rests on a doctrinal error. This is not a speech-forum case. *Tinker* provides the legal standard: restrictions on student speech are constitutionally permissible if school officials reasonably forecast that the speech "would materially and substantially disrupt the work and discipline of the school" or invade the rights of others. *Id.* at 513. Although this test is deferential to school officials and is "applied in light of the special characteristics of the school environment," *id.* at 506, it is stricter than the test for speech restrictions in a nonpublic forum. So the case must be remanded for application of *Tinker*. But only on A.L.'s claim. N.J.'s case is moot. He now attends Neenah High School and is no longer subject to the middle school's dress code.

## I. Background

In February 2020 N.J. was in seventh grade at Shattuck Middle School, which serves seventh- and eighth-grade students in the Neenah Joint School District in east central Wisconsin. N.J. is a supporter of the Second Amendment and enjoys hunting and target shooting. He owns several

T-shirts that express his support for the right to bear arms. On February 12 he went to school wearing a T-shirt emblazoned with an image of a revolver and the inscription "Smith & Wesson firearms—made in the USA since 1852." Here is a photograph of the shirt:



One of N.J.'s teachers noticed his T-shirt and referred him to David Sonnabend, Shattuck's associate principal. Sonnabend told N.J. that the T-shirt violated the school's dress code. N.J. had been warned several times earlier in the school year that he could not wear clothing depicting firearms. Sonnabend asked him if he had anything he could put on to cover up the shirt. N.J. pulled a sweatshirt from his backpack, put it on over the shirt, and returned to class. He was not disciplined.

The Shattuck Middle School dress code for the 2019–2020 school year is found in the school's parent handbook; the relevant portions are in the record. Nothing in the policy specifically prohibits students from wearing clothing depicting firearms. Instead, the dress code is stated in very general

terms: student attire must be "appropriate for a professional atmosphere and not disruptive to the learning environment." The policy explains that "students and families" are expected to "use their best judgment and common sense" when choosing attire. As a "reminder" to parents and students, the policy provides a nonexhaustive list of clothing that is not permitted: "[r]evealing, see-through, low-cut[,] or otherwise inappropriate tops"; "[s]hort-shorts or skirts"; "[s]agging" pants; attire with "slogans promoting tobacco, alcohol, drug use, or containing suggestive, sexual, or offensive references"; and "[h]ats, hoods, sunglasses, or any other head covering" that impedes recognition.

Shattuck administrators determined that any clothing depicting firearms is inappropriate in a learning environment and therefore violates the dress code. Faculty, students, and parents were advised of this unwritten rule, which applies regardless of whether the clothing expresses a message of support for or opposition to the right to bear arms.

Plaintiff A.L. is a student at Kettle Moraine High School, which serves students in grades 9 through 12 in the Kettle Moraine School District, a large suburban district about 30 miles west of Milwaukee. On February 19, 2020, when he was a sophomore, A.L. went to school wearing a T-shirt displaying the logo of Wisconsin Carry, Inc., a gun-rights organization. The logo features an image of a handgun. The back of the shirt displays the text of the state constitution's guarantee of the right to bear arms, but it wasn't visible because A.L. wore a jacket. Here is a photograph of the front of the shirt:



Justin Bestor, then the associate principal at Kettle Moraine High, notified school principal Beth Kaminski that A.L. was wearing a shirt displaying the image of a firearm. Kaminski called A.L. to her office, where she and Bestor told him that his shirt violated the school's dress code. A.L. zipped up his jacket to cover the shirt and returned to class. He was not disciplined.

Like Shattuck Middle School, Kettle Moraine High's dress code doesn't explicitly prohibit students from wearing clothing that depicts firearms. Rather, the dress code instructs students to "wear[] attire that supports actively engaging in the lessons and project based learning in the classroom" and "maintain[s] a positive atmosphere conducive to education." The policy provides an illustrative list of clothing that "do[es] not fit that description," including clothing with "exposed midlines or exposed bust lines"; "revealing undergarments"; "low cut and low riding pants"; and clothing with "inappropriate messages," e.g., clothing that "depict[s] or portray[s] conduct or messages [that] may be illegal or offensive." Kaminski and Bestor determined that any clothing depicting firearms is "inappropriate" and thus prohibited. This interpretation applies regardless of

whether the message on the clothing suggests support for or opposition to the right to bear arms.

N.J. and A.L., through their parents as next friends, sued Sonnabend and Kaminski in the Eastern District of Wisconsin seeking declaratory and injunctive relief enjoining the enforcement of the policies barring clothing that depicts firearms.[1] The suits are separate, but the students are represented by the same attorney. The complaints, which allege First Amendment violations and are nearly identical, were filed on February 13 and 20, respectively—which is to say, within 24 hours of each of the events we've just described. Although the captions state that Sonnabend and Kaminski are sued in their official *and* individual capacities, the complaints expressly state—in the first paragraphs—that the plaintiffs are "not seeking monetary damages." The suits are therefore limited to official-capacity claims for prospective relief.

Based on the close timing and the striking similarity of the complaints, Sonnabend and Kaminski—who, like the students, are represented by the same lawyer—moved to consolidate the cases. The district court granted the motion. In the meantime, the COVID-19 pandemic arrived, and the schools shifted to remote learning.

Following discovery, the combined case was submitted to the court on cross-motions for summary judgment. Briefing was completed in February 2021. By then N.J. was in eighth grade and A.L. was a junior, the COVID-19 pandemic was

---

[1] Two other students at Kettle Moraine High School were named as additional plaintiffs in A.L.'s lawsuit, but they withdrew from the case soon after it was filed.

almost a year old, and the schools had reopened for in-person learning. But A.L. continued to take classes from home because he objected to the school district's mask requirement.

In support of their motion, Sonnabend and Kaminski attested that the alarming increase in school shootings in recent years had amplified school-security concerns among faculty, parents, and students. Their declarations are highly generalized on this point, but both administrators specifically mentioned an incident at Waukesha South High School in December 2019 in which a school resource officer shot and wounded a student who brought a handgun to school. Waukesha South is about 10 miles from Kettle Moraine High. Sonnabend also cited an incident at Oshkosh West High School in December 2019 in which a school resource officer shot and wounded a student who stabbed him during an altercation. Oshkosh West is about 10 miles from Shattuck Middle School.

Sonnabend also explained that N.J. was placed in a special program for "at risk" students based on his history of behavior problems; for support he submitted N.J.'s disciplinary record. Sonnabend stated very generally that students were "uncomfortable, felt anxious, and did not feel safe when N.J. wore shirts with images of guns in their presence in class." Nothing in the record suggests that A.L. had similar disciplinary issues, although Kaminski mentioned in her declaration that A.L. "wore a confederate flag hat to school on previous occasions." She added that the high school "has also experienced racial tension over the 2019–2020 school year."

Finally, the administrators submitted a report from a proposed expert witness: Brad J. Bushman, a professor of communication at The Ohio State University. Professor Bushman holds a Ph.D. in social and personality psychology and studies human aggression and violence. In his report, the substantive portion of which is quite brief, he describes something called the "weapons effect"—a theory that viewing an image of a gun can have the effect of "priming or activating aggressive thoughts in memory" and that "[p]eople who are thinking aggressive thoughts are more likely to behave aggressively." The plaintiffs challenged the admissibility of Professor Bushman's report under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). They did not dispute his professional qualifications; they challenged the reliability of his methodology, asserting that the "weapons effect" theory has been the subject of scholarly criticism.

The judge ruled in favor of Sonnabend and Kaminski. He first addressed whether A.L.'s status as an at-home learner mooted his claim. The judge concluded that it did not. Although A.L. was not at that time attending school in person, he could return to in-person learning whenever he wished. Next, the judge turned to the threshold question whether wearing a T-shirt with an image of a firearm and words conveying support for the right to bear arms is a form of expression protected by the First Amendment. Sonnabend and Kaminski argued that it was not, but the judge disagreed. The T-shirts, he explained, expressed a "positive attitude toward firearms and the right to possess them."

Moving on, the judge declined to apply the standard articulated in *Tinker* for evaluating restrictions on student

speech. Instead, he looked to *Muller ex rel. Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), two speech-forum cases arising in the school setting. Applying the legal standard for evaluating speech restrictions in a nonpublic forum, the judge upheld the administrators' actions as both viewpoint neutral and reasonably related to the legitimate pedagogical concerns of reducing student anxiety and preventing the aggression that results from seeing an image of a firearm. On the latter point, and over the plaintiffs' objection, the judge admitted the proffered expert report from Professor Bushman describing the "weapons effect."[2]

## II. Discussion

We review the district court's summary-judgment order de novo. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). Where, as here, the case comes to us from a decision on cross-motions for summary judgment, we review the evidence and draw all reasonable inferences "in favor of the party against whom the motion under consideration [was] made." *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015).

### A. Jurisdictional and Procedural Issues

We begin with some jurisdictional and procedural issues, the resolution of which will narrow this dispute. As we've noted, the plaintiffs raise only official-capacity claims against the school administrators. The suits seek prospective relief blocking the enforcement of the school policies barring

---

[2] The plaintiffs do not challenge this ruling.

clothing that depicts firearms; both complaints expressly disclaim any request for damages.

This limited request for relief affects Kaminski's status as a defendant and N.J.'s status as a plaintiff. Shortly after we heard oral argument, Kaminski's attorney notified us that she is no longer the principal of Kettle Moraine High School and that Bestor succeeded her in that office. Because A.L.'s suit raises only an official-capacity claim for prospective relief, Kaminski drops out of the case and Bestor is substituted as the defendant pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure.

Additionally, we noted at oral argument that N.J.'s eighth-grade year ended soon after the district court entered judgment and he (presumably) had since moved on to high school. If he is now in high school, as we assumed, then he is no longer subject to the middle school's dress code or Sonnabend's enforcement of it. So we questioned the attorneys about mootness. Our inquiry seemed to come as a surprise to counsel for both sides, so we ordered supplemental briefs on the subject. Those briefs confirm that N.J. completed eighth grade and no longer attends Shattuck Middle School. Indeed, he has been a student at Neenah High School for the entire pendency of this appeal. That development clearly moots his case.

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies," U.S. CONST. art. III, § 2, a limitation that "subsists through all stages of federal judicial proceedings, trial and appellate," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks omitted). "[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation."

*Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020) (quoting *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017)). A federal court has no authority to give advisory opinions or decide questions that cannot affect the rights of the parties. *Chafin*, 568 U.S. at 172. "There is thus no case or controversy, and a suit becomes moot, when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quotation marks omitted). If the court's decision "can no longer affect the rights of litigants in the case before it," then the case is moot. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 626 (7th Cir. 2007).

Because N.J. now attends Neenah High School and is no longer subject to Sonnabend's enforcement of the middle school's dress code, a decision in his favor can bring no effectual relief. His case is moot.

The parties resist this conclusion in their supplemental briefs. N.J.'s attorney maintains that the suit is functionally against the Neenah School District, which (he says) is broadly responsible for the middle school's dress code and its enforcement. Because Neenah High School is in the Neenah School District, he argues that N.J.'s suit remains live. Curiously, Sonnabend's attorney agrees. He asserts without evidence that the high school has the same dress code as the middle school.

But N.J. did not sue the Neenah School District or any official with responsibility for enforcing the high school's policies. Nor is there any evidence in the record about the content of the high school's dress code or how school officials interpret and apply it. Because N.J. no longer has a stake in the interpretation and enforcement of the middle

school's dress code, his case is moot and must be dismissed for lack of jurisdiction.

A.L.'s claim, however, is not moot. Although he was taking classes remotely while his case was in the district court, the judge correctly concluded that he continued to have a legally cognizable interest in the outcome of the litigation because he could return to in-person classes at any time. Moreover, the parties have given us updated information about A.L.'s current attendance status. Masks are now optional at Kettle Moraine High. The school board lifted the mask mandate soon after the judge entered summary judgment.[3] Since then, A.L. has been attending classes in person, as the parties confirmed in their supplemental briefs. The dispute about his Wisconsin Carry T-shirt remains live.

## B. A.L.'s First Amendment Claim

We proceed, then, to the merits of A.L.'s First Amendment claim. As an initial matter, Bestor—now substituted as the defendant—insists that A.L.'s case does not implicate constitutionally protected speech at all. The judge was right to reject this contention, which mistakenly treats A.L.'s claim as if it rested on *conduct* rather than *expression*. It's true that certain forms of expressive *conduct* are entitled to constitutional protection only if the conduct is "'*inherently* expressive'" and "comprehensively communicate[s] its own message without additional speech." *Tagami v. City of*

_____

[3] *See* Stephen Plum, *Updated Letter: Board Votes to Make Masks Recommended Starting May 24*, KETTLE MORAINE SCH. DIST. (May 19, 2021), https://www.kmsd.edu/site/default.aspx?PageType=3&DomainID=15&ModuleInstanceID=21&ViewID=6446EE88-D30C-497E-9316-3F8874B3E108&RenderLoc=0&FlexDataID=8276&PageID=23.

*Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *Rumsfeld v. F. for Acad. & Inst'al Rts., Inc.*, 547 U.S. 47, 66 (2006)). But that standard doesn't apply here. This case isn't about expressive *conduct*; it's about speech.

Although "clothing as such" is not normally classified as constitutionally protected expression, "there can be speech printed on clothing … that convey[s] a political or other message." *Brandt v. Bd. of Educ.*, 480 F.3d 460, 465 (7th Cir. 2007). A.L.'s T-shirt fits the bill. The front of the shirt is imprinted with the logo of Wisconsin Carry, Inc., a gun-rights group. As the organization's name and the logo's image of a handgun imply, Wisconsin Carry endorses and advocates for the right to bear firearms.[4] Reinforcing this message, the back of the T-shirt contains the text of the provision in the Wisconsin Constitution securing the right to keep and bear arms in state law. *See* WIS. CONST. art. I, § 25. A.L.'s T-shirt, through its text and the image of a handgun, conveys a political message—a positive opinion of firearms and support for the right to bear them. The shirt qualifies as a form of protected expression.

One final threshold matter warrants clarification before we reach the substance of A.L.'s claim. As we've explained, the dress code at Kettle Moraine High does not, on its face, prohibit clothing depicting firearms. When we asked at oral argument whether A.L. was raising a facial or an as-applied constitutional challenge, his counsel equivocated; he seemed to want to keep all theories on the table. Yet we see no factual or legal basis for a facial challenge in the briefing on

---

[4] *See* WIS. CARRY, INC., http://www.wisconsincarry.org/ (last visited June 15, 2022).

appeal. The plaintiffs *did* raise an overbreadth argument in the district court, but the judge rejected it and the argument is not mentioned on appeal. What's left is a challenge to Kaminski's interpretation and application of Kettle Moraine High's dress code on these particular facts—more precisely, a challenge to her determination that all clothing depicting firearms is "inappropriate" and thus prohibited under the code. Bestor endorsed Kaminski's interpretation and was directly involved in enforcing it, so his substitution as the defendant does not leave an evidentiary gap about how *he* interprets and enforces the dress code.

With that point clarified, we come at last to the substance of A.L.'s claim. The Supreme Court's foundational student-speech decision is *Tinker*, the seminal 1969 case involving several high-school and junior-high students who were suspended for wearing black armbands to school to express their opposition to the Vietnam War. 393 U.S. at 504. They sued school officials for violating their First Amendment rights. The Court agreed that their armband protest was protected speech and announced a legal standard for evaluating restrictions on the constitutional right of public-school students to express their opinions.

The Court began by confirming the basic principle that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. Absent a "specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511. But the speech rights of students do not mirror those of adults. The Court explained that student-speech claims must be evaluated "in light of the special characteristics of the school environment." *Id.* at 506.

Those special characteristics include "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507. Balancing the speech rights of students with the need for school officials to set standards for student conduct, the Court held that restrictions on student speech are constitutionally justified if school authorities reasonably forecast that the speech in question "would materially and substantially disrupt the work and discipline of the school" or invade the rights of others. *Id.* at 513.

The "substantial disruption" standard announced in *Tinker* requires "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. An "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508. The armband-wearing students had been punished for "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance," or any "interference, actual or nascent," with the school's work or "the rights of other students." *Id.* The record contained no facts that "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." *Id.* at 514. Under these circumstances, the Court held that suppressing the students' speech violated their rights under the First Amendment. *Id.*

Since *Tinker* the Court has identified "three specific categories of student speech that schools may regulate" regardless of whether the circumstances satisfy *Tinker*'s "substantial

disruption" standard. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2045 (2021). The first and perhaps most obvious category is "indecent[,] … vulgar[,] and lewd speech." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). *Fraser* concerned a high-school student who was suspended for delivering a "sexually explicit monologue" to an "unsuspecting audience of teenage students" at a school assembly. *Id.* The Court held that school officials acted well within their broad authority, recognized in *Tinker*, to discipline the student for his lewd speech because it was "wholly inconsistent with the fundamental values of public school education." *Id.* at 685–86 (quotation marks omitted). The Court did not apply *Tinker*'s "substantial disruption" standard to this category of student speech. It was enough that allowing the student's sexually explicit speech to go unpunished "would undermine the school's basic educational mission." *Id.* at 685.

Second, the Court has held that school officials may regulate student speech "that can reasonably be regarded as encouraging illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 397 (2007). *Morse* involved a high-school student who was suspended for unfurling a large banner bearing the phrase "BONG HiTS 4 JESUS" at a school-sponsored event in front of the school. *Id.* The banner's meaning was "cryptic," *id.* at 401, but school officials reasonably concluded that it promoted illegal drug use, *id.* at 410. The Court held that "[t]he First Amendment does not require schools to tolerate at school events student expression that contributes to [the] dangers" of illegal drug use. *Id.* Again, the Court did not apply the test announced in *Tinker*. The upshot is that school officials may regulate this category of student speech without regard to *Tinker*'s substantial-disruption standard.

The third category is student expression that others "might reasonably perceive to bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). *Kuhlmeier* concerned the authority of school officials to maintain editorial control over the content of a high-school student newspaper. The newspaper was sponsored, supported, and supervised by the school, and a faculty member directed and reviewed the work of the student journalists. Under these circumstances, the editorial content of the newspaper—although student written—carried the imprimatur of the school. The issue, then, was not the same as in *Tinker*: the question was not whether the school must *tolerate* particular student speech but whether it must *affirmatively promote* particular student speech. *Id.* at 270–71. In other words, the Court had to decide "when a school may refuse to lend its name and resources to the dissemination of student expression." *Id.* at 272–73. The *Tinker* standard was a poor fit.

The Court instead applied its First Amendment forum doctrine, concluding that the school-sponsored newspaper was a nonpublic forum. *Id.* at 267–70. As such, school officials were entitled to regulate its contents "in any reasonable manner." *Id.* at 270. Adapting this standard to the public-education setting, the Court held that school officials may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

Tracing these key student-speech precedents brings into sharper focus the core doctrinal question in this case: Does A.L.'s claim fall within any of the three categories of cases

that may be resolved without regard to *Tinker*'s substantial-disruption standard? The answer is "no." A.L.'s Wisconsin Carry T-shirt isn't like the lewd sexual speech at issue in *Fraser*. Nor is it analogous to the student's banner in *Frederick*, which was reasonably understood to promote illegal drug use, or the school-sponsored student newspaper in *Kuhlmeier*. The default rule is the one announced in *Tinker*.

The judge expressly declined to apply *Tinker*, opting instead to analyze this case under our decision in *Muller*. That was a mistake, but perhaps an understandable one. *Muller* involved a fourth-grade student who was denied permission from the school principal to disseminate fliers at school inviting classmates to attend a Bible study at his church. 98 F.3d at 1532–33. The case produced a fractured decision. Judge Manion, writing for himself, traced the evolution of the Supreme Court's student-speech cases—from *Tinker* to *Kuhlmeier*—and suggested that the speech rights of elementary-school students might not enjoy much protection at all. *Id.* at 1535–39 (opinion of Manion, J.). No other judge on the panel joined this part of his opinion. He ultimately settled on *Kuhlmeier* as supplying the proper framework for decision. *Id.* at 1537, 1539. After concluding that the elementary school was a nonpublic forum, he asked only whether the restriction on the student's distribution of literature was reasonable. *Id.* at 1541 ("In a nonpublic forum, only unreasonable restrictions are forbidden.").

Judge Eschbach agreed with the application of the *Kuhlmeier* standard and joined this part of Judge Manion's opinion. *Id.* at 1545 (Eschbach, J., concurring). He also joined Judge Manion's treatment of an argument about content and viewpoint discrimination. After acknowledging the general

rule that government officials may not restrict speech based on its content or viewpoint, the majority explained its view that the neutrality rule was incompatible with the basic role of public education. *Id.* at 1542. Summing up, the majority held that although a school "may not act unreasonably, [it] need not tolerate student expression of viewpoints [that] are fundamentally 'inconsistent with its basic educational mission.'" *Id.* (quoting *Kuhlmeier*, 484 U.S. at 266). Under the lenient "reasonableness" standard, the majority upheld the school's speech restriction. *Id.* at 1543.

Judge Rovner concurred. *Id.* at 1545–47 (Rovner, J., concurring in part and concurring in the judgment). In her view "a more searching review, akin to that applied in *Tinker*," was required. *Id.* at 1546. But she concluded that the principal's action survived review even under that "more stringent review," so she joined the majority in upholding the restriction. *Id.* at 1547.

We take no position on the outcome in *Muller*, but we think it's clear under recent Supreme Court caselaw that Judge Rovner was right and the majority's decision to apply *Kuhlmeier* was in error. As explained, the Court has recognized three categories of student speech that may be regulated without regard to the *Tinker* standard. The *Kuhlmeier* category is plainly limited to "speech that others may reasonably perceive as 'bear[ing] the imprimatur of the school,' such as that appearing in a school-sponsored newspaper." *Mahanoy*, 141 S. Ct. at 2045 (alteration in original) (quoting *Kuhlmeier*, 484 U.S. at 271). The *Muller* majority did not apprehend this limitation; the church fliers at issue there could not reasonably be perceived as bearing the imprimatur of the school.

We add, however, that we do not understand the list of three *Tinker*-exempt categories—most recently synthesized in *Mahanoy*—to be exclusive; other categories might emerge on new facts. It's enough for present purposes to say that nothing in *Muller* justified an expansion of the list. *Muller*, in turn, led to the judge's doctrinal misstep in this case, so clarification is warranted. Because *Muller* mistakenly applied *Kuhlmeier* and speech-forum analysis, it is overruled.[5]

It follows that it was error for the judge here to apply *Muller* and *Kuhlmeier*. Unlike the high-school student newspaper in *Kuhlmeier*, nothing about A.L.'s T-shirt bears the imprimatur of his school. No observer would construe the message on his T-shirt as school-sponsored or school-endorsed speech. Rather, A.L.'s Wisconsin Carry T-shirt is materially indistinguishable from the black armbands in *Tinker*. It's an expression of his political opinion, just like the armbands expressed the students' opposition to the Vietnam War. *Tinker* is the controlling authority.

We reached the same conclusion on similar facts in *Nuxoll ex rel. Nuxoll v. Indian Prairie School District No. 204*, 523 F.3d 668 (7th Cir. 2008), another student T-shirt case. There we considered whether a high school could prohibit a student from wearing a T-shirt with the slogan "Be Happy, Not Gay" in response to the school's "Day of Silence" celebration, which promoted tolerance of homosexuality. *Id.* at 670. The school's dress code—like Kettle Moraine High's—used broad language prohibiting all "derogatory com-

---

[5] Because this opinion overrules circuit precedent, we circulated it to the active members of the court under Circuit Rule 40(e). No judge requested to hear this case en banc.

ments," including those that refer to sexual orientation. *Id.* We reversed the district court's denial of a preliminary injunction, holding that barring the student from wearing the shirt likely violated the *Tinker* standard. *Id.* at 675–76. When the case returned after final judgment under the name *Zamecnik v. Indian Prairie School District No. 204*, we upheld a permanent injunction against the school and affirmed an award of nominal damages. 636 F.3d 874, 879–81 (7th Cir. 2011).

*Nuxoll* applied the *Tinker* standard to factual circumstances materially identical to this case. But the judge declined to follow it, finding the case distinguishable because the school's action in banning the student's "Be Happy, Not Gay" T-shirt was not viewpoint neutral. That's true, *see Nuxoll*, 523 F.3d at 670, but it's not a reason to cast aside *Tinker* in favor of *Kuhlmeier*. To repeat: *Kuhlmeier*'s regulation-permissive test applies when the speech in question might reasonably be perceived "as bear[ing] the imprimatur of the school." *Mahanoy*, 141 S. Ct. at 2045 (alteration in original) (quotation marks omitted). A.L.'s T-shirt doesn't qualify.

We return, then, to the *Tinker* standard: restrictions on student speech are constitutionally justified if school officials can show that the speech in question "would materially and substantially disrupt the work and discipline of the school" or invade the rights of others. 393 U.S. at 513. It's not necessary to prove "that unless the speech at issue is forbidden[,] serious consequences will *in fact* ensue." *Nuxoll*, 523 F.3d at 673. But mere speculation won't do, *id.* at 676, and there's no "generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students," *Zamecnik*, 636 F.3d at 877. Rather, school officials must

present "facts [that] might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or the invasion of the rights of others. *Tinker*, 393 U.S. at 514; *see also Nuxoll*, 523 F.3d at 673. It's an objective inquiry, and *Tinker* places the burden of justifying student-speech restrictions squarely on school officials. *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (collecting cases).

At the same time, the *Tinker* standard acknowledges the broad authority of school officials to maintain order and discipline and establish conditions in the school environment that are conducive to learning. "[W]e must not ignore the Supreme Court's admonition that 'a school need not tolerate student speech that is inconsistent with its basic educational mission.'" *Brandt*, 480 F.3d at 467 (quoting *Kuhlmeier*, 484 U.S. at 266). The application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of the school or student body in question. Temporal factors and recent events might be relevant. And the inquiry accounts for the professional knowledge and experience of school administrators in setting and enforcing disciplinary standards. *Tinker*, 393 U.S. at 507 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority … of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.").

Because the judge did not apply *Tinker*, the prudent course is to remand to allow him to do so in the first instance. The parties' arguments on appeal mostly concerned

the choice of legal standard rather than its application; the briefing contains only limited analysis of A.L.'s case under the substantial-disruption standard. With the legal framework clarified, the judge may want to invite new submissions from the parties.

Accordingly, we vacate the judgment and remand for further proceedings in A.L.'s case. On remand N.J.'s case must be dismissed for lack of jurisdiction.

VACATED AND REMANDED WITH INSTRUCTIONS